## Case No. 12,451.

SCHENCK v. PEAY et al.[1]

PEAY v. SCHENCK et al.

Circuit Court, E. D. Arkansas. April Term, 1869.

TAXATION—TAX SALE—STATUTE — REPEAL—LIEN-HOLDERS—TENDER.

1. The act of July 20, 1868, declaring that acts performed by any two of the tax commissioners shall have the same effect as if performed by all three. though retrospective, is not therefore repugnant to the constitution. Such act does not give validity to the acts of two commissioners unless three were in office.

2. A person appointed to an office without authority, and who never performed an official duty as such officer, is not an officer, de jure or de facto.

3. Where an office is created and takes effect during a session of the senate, and a subsequent session of congress passes without the same being filled, the president cannot make a valid appointment to such officer during a recess of the senate.

4. A subsequent statute. inconsistent with or repugnant to a former statute, repeals it by implication.

5. A court of equity will set aside a tax sale where there was fraud and collusion between the officer making the sale and the purchaser.

6. Under the act of congress of June 7, 1862. providing for the collection of direct taxes in insurrectionary districts, the penalty of 50 per cent. could not be assessed on lands at the date of the apportionment of the direct tax. An assessment of the penalty simultaneously with the apportionment was unauthorized, and rendered void a sale for taxes under such assessment and apportionment.

7. Congress may declare a forfeiture for nonpayment of taxes that will take effect ipso jure. But the courts will not give it such construction unless the intention that such should be the effect clearly appears.

8. A lien creditor of the owner of the fee is an "owner of the land," in the meaning of the act of 1862. and for the purpose of paying taxes on the land on which he has a judgment or attachment lien, or for the purpose of redeeming the same from tax sale.

9. A lawful tender of the tax on lands to the officer authorized to receive it is tantamount to an actual payment. and divests the authority of the officer to sell the land for taxes.

[This was a bill in equity by Washington L. Schenck against Gordon N. Peay and Calvin C. Bliss, and a cross bill by Gordon N. Peay against Washington L. Schenck and Calvin C. Bliss. The cause was heard upon a demurrer to the cross bill, and a motion on behalf of the plaintiff for an injunction and a receiver. An order was made for the appointment of a receiver and also for an injunction restraining Schenck and Bliss from interfering with the receiver. Case No. 12,-450. The cause is now before the court for final hearing.]

Rice & Benjamin and T. D. W. Yonley, for Schenck and Bliss.

Watkins & Rose, Gallagher & Newton, and Stillwell, Wassell & Moore, for Peay.

CALDWELL, District Judge. The opinion of the court, delivered in this case at the last term, by Justice Miller, on the motion for the appointment of a receiver, contains a statement of the case and the pleadings down to that time, and I shall content myself with taking up the case where that opinion left it, regarding that opinion as the law of the case on all points covered by it.

After the judgment of the court given on the motion to appoint a receiver, and on the 5th day of October. 1868, Schenck filed an amended bill, in which he alleges that his information in relation to the appointment of a board of direct tax commissioners for this state was derived from hearsay, and not from official sources. and that the averment in his original bill that said board of tax commissioners. as originally appointed. consisted of Hulings Cowperthwaite, Enoch H. Vance, and Daniel P. Tyler, was a mistake of fact; that on or about the 15th day of July, 1868. he caused further inquiry to be made as to when said board of commissioners was appointed. and of whom it consisted. and whether a full board of commissioners was in commission at the time of the opening of the tax office by Commissioners Cowperthwaite and Vance, and found that the president, in pursuance of the act of congress creating said board. "did. sometime in July, 1864, during the recess of the senate of the United States, appoint and commission a board of direct tax commissioners for the district of Arkansas. consisting of the said Hulings Cowperthwaite. Enoch H. Vance, and Josiah Snow." each of whom qualified as required by law, "and that afterwards, to wit. in the month of February, 1865, the names of the said Hulings Cowperthwaite, Enoch H. Vance, and Josiah Snow were regularly sent to the senate of the United States for confirmation. and the said Cowperthwaite and Vance regularly confirmed as such tax commissioners, and the said Josiah Snow rejected. and that thereupon Tyler was appointed by the president and confirmed by the senate."

In his amended bill. Schenck admits that "it is true. as set forth in complainant's original bill, that but two of said commissioners, to wit. Cowperthwaite and Vance, were present. acting or to act as such commissioners. at the time of the opening of said tax office, or at any time until after the sale of the real estate mentioned in complainant's said original bill for the payment of the direct tax due thereon." but avers that. during all that time. there were three commissioners duly appointed and in com-

[1] [Published from copy furnished through the courtesy of Hon. Henry C. Caldwell, Circuit Judge. The syllabus is reprinted from a condensed report of the case by Hon. John F. Dillon. Circuit Judge, in 1 Dill. 267. Partial reports are likewise contained in 10 Int. Rev. Rec. 54, 2 Am. Law T. Rep. U. S. Cts. 112. 1 Chi. Leg. News. 363. and 11 Int. Rev. Rec. 22.]

mission, and that in such case two might lawfully perform the duties and execute the powers conferred by the law on a board of three tax commissioners, "but that if this is not so, the defect in the title acquired by Bliss, by his purchase at the tax sale, growing out of the absence of one of the commissioners," is fully and completely cured, and said title rendered valid, by the provisions of an act of congress approved March 3, 1865 [13 Stat. 501], entitled "An act further to amend an act entitled an act for the collection of direct taxes in the insurrectionary districts, within the United States, and for other purposes, approved June seven, eighteen hundred and sixty-two," and an act entitled "An act concerning the tax commissioners for the state of Arkansas, approved July 20, 1868," as the same could or would have been had all three of said tax commissioners been present and acting from the time of the opening of said tax office until after the sale of said property. Like averments in relation to the appointment of commissioners and the curative acts of congress are contained in the answers of Schenck and Bliss, respectively, to the cross bill filed by Peay.

Peay, in his answer to the amended bill, admits that, some time in the summer of 1864, and while congress was not in session, the president appointed Cowperthwaite, Vance, and Snow tax commissioners for the district of Arkansas, but denied that Snow ever qualified as such commissioner in the manner prescribed by law, and denies that there was, at any time before the sale for taxes of the property in question, "a full board of direct tax commissioners for the said district of Arkansas, duly appointed, commissioned, and qualified to act as such." In reference to the acts of congress relied on by Schenck as curing the defects in this title, Peay says these acts were procured by the exertions and fraudulent representations of Cowperthwaite, one of the tax commissioners, and Bliss, and sets out very minutely the facts and circumstances connecting Cowperthwaite and Bliss with the passage of these acts, denies their validity, particularly assailing the act of July 20, 1868, and denies that, if valid, they have the effect claimed for them.

That section 3 of the act of March 3, 1865 (13 Stat. 501), does not heal the infirmity in the tax title, has already been shown in the opinion of the court, delivered by Justice Miller at the last term. Does the act of July 20, 1868 [15 Stat. 123], cure the defect? That act declares "that the acts and proceedings which have been had or performed by any two of the tax commissioners in and for the state of Arkansas, shall have the same force and effect, as if had and performed by all three of said commissioners." Unlike the act of 1865, this act is retrospective in its terms and operation, and this is the only difference between this act and the third section of the act of 1865. It is earnestly insisted by defendants' counsel that this act is unconstitutional; that though states may (when not prohibited by their constitutions) pass retrospective laws, congress cannot. There is no such distinction as is here attempted to be made. The power of congress to pass laws on subjects within the acknowledged scope of the constitutional grant of legislative power is not restricted to laws prospective in their operation. Many retrospective statutes have been passed by congress, and whenever their power to do so has been questioned, it has been sustained. U. S. v. The Peggy, 1 Cranch [5 U. S.] 103; Sampeyreac v. U. S., 7 Pet. [32 U. S.] 222; The Prize Cases, 2 Black [67 U. S.] 670-671.

Without undertaking to define the boundaries of legislative power in this direction, it is sufficient to say that this act is not obnoxious to the constitutional objections brought against it. See opinion in this case at last term. [Case No. 12,450.] The legal effect of the act is to give to the official action of two commissioners "the same force and effect, as if had and performed by all three of said commissioners." This act does not dispense with the necessity of "a board of three commissioners," but simply provides that the acts "of any two of the tax commissioners" shall have the same force and effect as if had and performed by "all three of said commissioners." Before the complainant can be benefited by this act, it must appear that "all three of said commissioners" had an official existence at the time the material acts were performed by the two commissioners which, it is claimed, resulted in divesting the defendants' title to the property in question. It is alleged in all the pleadings, and conceded in the argument, that the appointments of Cowperthwaite, Vance, and Snow, as direct tax commissioners for the district of Arkansas, were the first and original appointments to that office; that they were made in "the recess of the senate," and "when congress was not in session," and without the advice and consent of the senate.

In the documentary evidence submitted by the complainant are what purport to be copies of the first commissions issued to these commissioners. They bear date July 5, 1864, and recite that the appointment is made "by and with the advice and consent of the senate." This recital in the commissions, it is conceded at the bar, is a mistake. The appointments were made in July, 1864, in the recess of the senate, and the same parties nominated to the senate for confirmation, in February, 1865, when two of them, Vance and Cowperthwaite, were confirmed, and Snow rejected, and Tyler was thereupon nominated to and confirmed by the senate. On the 25th of August, 1864, Snow took the oath of office required by law, and on 9th of September of the same year he filed a bond which it appears was never approved by the secretary of the treasury as required by the 5th section of the act of 1862.

Snow never reported for duty, never drew any salary as such commissioner, and never did any act under or by virtue of his appointment as such commissioner, and was not in the district from the date of his appointment until the spring of 1868, which was long after the collection of the tax had been suspended, and the office of the tax commissioners closed.

1. Under this state of facts, was Snow a direct tax commissioner for the district of Arkansas? It is conceded that, if Snow was de facto in the exercise of the duties of the office of commissioner, his official acts as such de facto commissioner would be as valid as if he had a valid appointment to the office. But, to make him an officer de facto, it is not enough to show a void commission, but it must also appear that he was de facto in the exercise of the duties of his office. An officer de facto is one who performs the duties of an office with apparent right, and under claim and color of appointment, but without being qualified in law so to act. A person who has no legal title to an office, and who has never performed a single duty pertaining to such office, is not an officer, either de facto or de jure. See Bour. Law Dict. tit. "De Facto," and authorities there cited. Snow never fully qualified. His bond was never approved. He never exercised or performed, or attempted to exercise or perform, a single duty or function as such commissioner, and never was within the territorial limits of his official jurisdiction. The fact that his name had ever been used in connection with the office was unknown to the purchaser at the tax sale for more than three years after the purchase. When one, under color of right, exercises the duty of a public office, he is an officer de facto, and his acts are held valid, as respects the rights of third persons, and as concerns the public, to prevent a failure of justice. This rule extends only to prevent mischief and injury to such as confide in the acts of persons so acting without right. 7 Johns. 549; 7 Serg. & R. 386. In this case Bliss did not purchase on the faith of Snow being an officer, either de facto or de jure. He never had the reputation of being such an officer. More than a year after the purchase, Bliss and his grantee come into court and base their title to the property in question on the acts of Cowperthwaite and Vance alone, and allege that they were the only commissioners in office. They do not now claim any right or title by virtue of any act of Snow as commissioner, because he never performed a single official act. They must, then, in order to meet the requirements of the act of July 20, 1868, show that he was an officer de jure. Have they done so?

2. The office in question was created by the fifth section of the act of June 7, 1862 (12 Stat. 422), which provides that "the president of the United States, by and with the advice and consent of the senate, may appoint a board of three tax commissioners for each of said states in which such insurrection exists." No appointment of such commissioners was made for this district at that or the subsequent session of congress; but in July, 1864, after congress had adjourned, and in the recess of the senate, the president appointed Snow a "direct tax commissioner for the district of the state of Arkansas." It will be remembered that this was the first or original appointment to this office. The complainant relies upon this commission to establish title in Snow to the office. It is objected that the commission is void, and invested Snow with no title to the office. If the president did not have authority to make the appointment in the time and manner that he did, his commission amounts to no more than if it had emanated from the secretary of the treasury, or any other officer acting without authority in the premises. In either case, it might be "color of office," that would make the acts of Snow, if he had performed any, good as a de facto officer; but in neither case would the commission alone prove title in Snow to the office, or entitle him to be regarded as such officer in law. If the president had the authority to make an original appointment to this office when the senate was not in session, that authority must be found in the constitution. It is not to be found in the act creating the office, or in any other act of congress. The constitutional provisions on the subject of the president's power to appoint are: First, that he shall nominate, and by and with the advice and consent of the senate, shall appoint, all officers whose appointments are not otherwise provided for in the constitution, and which shall be established by law; second, that the president shall have power to fill all vacancies that may happen during the recess of the senate by granting commissions which shall expire at the end of the next session. Const. art. 2, § 2.

It is not pretended that, under the first of these clauses, an appointment by the president, without the "advice and consent of the senate," would be of any validity. It is under the second clause that the validity of Snow's appointment is attempted to be sustained. The question turns upon the construction of the words, "vacancies that may happen during the recess of the senate." The office to which he was appointed was created by an act of congress two years prior to his appointment. There had been two sessions of congress, and the office had not previously been filled. It seems clear that this was not a vacancy that happened during the recess of the senate. The office was created and went into effect while the senate was in session. The vacancy, if that term is at all appropriate in this connection, was created by congress, and existed while the senate was in session, and therefore did not "happen during the recess of the senate." It may have existed, but did not happen, during the recess of the senate.

The following is Mr. Webster's definition of the word "happen": "First. To come by chance; to come without previous expectation; to fall out. Second. To take place; to

occur." And the same learned lexicographer, in giving a definition to the word "vacant," says, among other things: "Vacancy adds the idea of a thing having been previously filled."

The question of the proper construction of this clause of the constitution has frequently been referred by the executive department of the government to the attorney general. The facts in the cases referred to have been various, and the opinions not always such as can be reconciled. The identical question here raised was referred by Mr. Polk in 1845 to the then attorney general, Mr. Mason, who made the following response: "The only question involving executive authority and action is, 'Have you now, in the recess of the senate, the power to appoint the district judge, the district attorney, and the marshal whose offices were created by the act entitled "An act supplemental to the act for the admission of the states of Iowa and Florida into the Union," approved March 3, 1845?' The question has often occurred, and the interpretation of the constitution has been so well established, that I cannot doubt on it. If vacancies are known to exist during the session of the senate, and nominations are not then made, they cannot be filled by executive appointments in the recess of the senate. And the rule is the same where offices are created by law taking effect during the session of the senate, and no nominations are made." 4 Opp. Attys. Gen. U. S. 361. And the opinion of the supreme court of Illinois (People v. Forquer, 1 Breese, 104) is not less pointed and direct. Mr. Sergeant, in his work on Constitutional Law (page 373), and Judge Story, in his work on the Constitution (section 1559), in commenting on this clause of the constitution, quote, in a manner to imply approval, the action of the senate in 1822, when that body declared "the word 'happen' had relation to some casualty not provided for by law," and that, "if the senate be in session when offices are created by law which have not as yet been filled, and nominations are not then made to them by the president, he cannot appoint to such offices during the recess of the senate, because the vacancy does not happen during the recess of the senate," and that, "in many instances where offices are created by law, special power is on this very account given to the president to fill them during the recess," and it is added "that in no other instances had the president filled such vacant offices without special authority of law."

It would be a work of supererogation for me to go into a lengthy argument and citation of authorities on this question, after the learned and exhaustive opinion recently delivered on the question by Judge Cadwallader, of the district court of the United States for the Eastern district of Pennsylvania. Case of the District Attorney [Case No. 3,924]. I am satisfied to rest my opinion on the authority of that case. It is a judicial exposition of the clause of the constitution in question, pronounced, as the opinion itself shows, after full argument and a careful consideration of the question, both on principle and authority, and is justly entitled to great weight.

The office to which Snow was appointed in the recess of the senate, having been created and not filled at the session of congress at which it was created, nor at the next subsequent session of that body, his appointment was without authority of law and void; and Snow not being a commissioner, either de jure or de facto, it follows that there were but two commissioners in office, or acting as such, during the time the proceedings were had under and by virtue of which the complainant claims title to the property in question, and that his title is void for that reason. I have previously shown that the act of July 20, 1868, could have no operation unless it was established that "all three of said commissioners" were in office during the time mentioned. For myself, I would be satisfied to rest the decision of this case on this point; but, as there are many other cases of the same character pending in this court in which the pleadings and proof may not present this question, and as the other questions in this case, that must arise in the cases yet to be tried, have been elaborately argued by counsel, who are also counsel in the other cases, and it is desired to have the opinion of the court upon them, regarding this as a test case, I will proceed to dispose of the other questions.

3. Peay, in his cross bill, charges a conspiracy and combination, on the part of the defendant Bliss and one of the tax commissioners, to deprive him of his property by fraudulent, illegal, and oppressive means, and that the tax title in question was acquired in consequence of that agreement, and by the grossly illegal and fraudulent action of the commissioners and Bliss. And he also alleges and relies upon various irregular and illegal acts in the proceedings of the tax commissioners, which will be noticed hereafter. The particular acts relied upon to establish fraud are set out in great detail, and to support these averments the depositions of some 30 or 40 witnesses have been taken and read on the hearing. Schenck and Bliss deny the allegations of fraud, and rest on that denial. The depositions on this point establish these facts: That Cowperthwaite came to Little Rock, in the capacity of tax commissioner, some time in the winter of 1864–65; that he and his co-commissioner, Vance, soon after opened an office, and proceeded to apportion the direct tax on the real estate within the corporate limits of that city; that about that time Bliss and Cowperthwaite became very intimate; that Bliss was much of the time in the office of the tax commissioners, and had the freedom of the office, and access to the tax books and papers pertaining to the office, a privilege that was denied to others; that Cowperthwaite assumed the sole control and

management of the business of the office, his co-commissioner, Vance, acting under his directions, and having little or nothing to say in the conduct of the business; that Cowperthwaite announced and gave out that owners of property must appear in person to pay their taxes, and that he adhered to this rule and refused to receive taxes except when tendered by the owners of the property in proper person, though in a few instances it was relaxed for the benefit of favored parties; that he also gave out that it would be regarded as a military offense by the commanding general of the department for any one to attempt to pay the taxes on property when the owner was absent, engaged in the Rebellion, or within the rebel lines, and the defendant in this case was in that predicament; that the effect of this threat in the then disturbed and unsettled condition of this country, where military authority was paramount and martial law prevailed, was to deter agents and other persons from paying or offering to pay the taxes on the property of their principals and friends, and that, but for the fear and terror thus inspired, little or none of the property taxed would have been delinquent or gone to sale; that he refused to permit the owners of property to pay their taxes, unless they appeared in person and produced their title papers, or other evidence, to satisfy him that they were the legal owners of the property in 1861, holding that no person engaged in the Rebellion could make a valid conveyance of his property, and that the grantee of such a person could not pay the taxes upon the property; that he declared the spirit and intention of the direct tax law was to sell the property, and not to collect the tax, that 'it was "the twin sister of the confiscation law, and more complete in its operation"; that his official action was in consonance with his understanding of the object and purposes of the law; that in February, 1865, Cowperthwaite went to Washington city; that, when he returned, some time in March, he brought with him a copy of the act of March 3, 1865, and stated that he drew the act, and had it passed, and that he went to Washington for that purpose; that about the time of his return from Washington, the purpose of Bliss to purchase largely at the coming tax sale on the 4th of May became known; that Bliss, at that time, was confessedly without means or property of his own, and stated that the money to make the proposed purchases at the tax sale was furnished by "other parties"; that Cowperthwaite stated he was tendered a position in Virginia, but that he took that of tax commissioner for this state "because he could make more money here"; that, when a witness requested Bliss to permit him to bid in at the tax sale, without competition, a certain parcel of property for the owner, who was absent, Bliss told him he could not consent to do so, because he had agreed to bid it in for one of the tax commissioners; that

Bliss was the chief bidder at the tax sale, where his bids amounted to $27,690 for property valued at $209,000, the taxes upon which, after adding penalty of 50 per cent., interest, and costs, were $460.51, and the yearly rents of which, at that time, were $29,500. And the evidence tends to show that certificates of purchase were issued to Bliss, and that he was put into possession of the property purchased by him by the marshal, by virtue of writs of possession issued by the commissioners, in accordance with the provisions of section 1 of the act of 1865, before he had paid his bids for said property, and that he finally paid his bids on some of them with money realized out of the rack rents, then prevailing in this city, consequent on the presence of a large army with its attendant train of camp followers, which he received as lessor of the property after he was put in possession. Bliss, in his answer to the cross bill, denies that the certificates of purchase were delivered before he paid his bids, but he does not deny that he was put in possession before the bids were paid, and he "admits that a portion of said purchase money was realized out of the rents of said property, but he avers that the greater portion thereof was paid out of means other than said rents." But this denial relates to the rents of the property here in suit, and is not inconsistent with the supposition that the balance of the money was derived from the rents of other property purchased by him at the tax sale and not embraced in this case. Opposed to the mass of depositions establishing these facts is the answer of Bliss, unsupported by a single witness. The commissioners, and Cowperthwaite particularly, who could, if the facts would warrant them or him in so doing, deny or explain this evidence and these suspicious circumstances, and repel the inference of fraud justly deducible therefrom, are not brought on the stand.

Enough has been shown to overthrow the answer, and warrant a reasonable and just conclusion against the defendants in the cross bill on this issue, in the absence of explanation or contradiction, which it was in their power to make if the facts would warrant it; and, not having made it, or offered to do so, the court cannot do otherwise than adopt the conclusion to which the proof tends. Section 3 of the act provides: "It shall be lawful for the owner or owners of said lots or parcels of land, within sixty days after the tax commissioners herein named shall have fixed the amount, to pay the taxes thus charged." Of course, this section does not require owners to appear in person to pay their taxes, or to produce proof of title as upon a trial in ejectment, or to show that they owned it anterior to the passage of the confiscation laws; and yet the commissioners, on their own motion, added all these onerous and extraordinary requirements as conditions precedent to the right of the owners to pay their taxes. Agents, attorneys in fact, tenants, lien cred-

itors, and others, who during this 60 days sought to pay taxes for their principals, debtors, or friends, as the case might be, were denied the right so to do. And in this very case the taxes on the property sold were twice tendered by lien creditors before the sale. Not only so, but to prevent the payment or tender of taxes by agents and others for absent owners, Commissioner Cowperthwaite gave out that an effort on their part so to do would be regarded as a military offense, to be punished summarily and with the rigors of martial law,—an intimation, under the circumstances, entirely effectual to accomplish the end desired. And of all this Bliss not only had notice, but it is a fair inference from the proof that he connived at, counseled, and abetted these illegal proceedings, in order that he might have an opportunity to bid the property in at the tax sale, and that, in this enterprise, he had the active aid and co-operation of at least one of the commissioners. For, while the proof is overwhelming as to the illegal and oppressive action towards property owners, it also shows that the action of said commissioner toward and with Bliss was equally illegal for its gross partiality and favoritism. It was not illegal for them to give Bliss the freedom of their office, if they chose to do so, nor to permit him to examine the tax books, because all persons had that right, though it seems to have been denied to some persons at least; but it was illegal and fraudulent for them, or either of them, to engage Bliss to purchase property for them at the tax sale, and to put him in possession of property bid in by him at the tax sale before he had paid his bid therefor, and for the purpose of enabling him to pay such bid out of the rents of the very property itself.

In reviewing these proceedings, it is just and proper that we should take into consideration that, at the time they were had, this city was in fact a military camp in "enemy's territory"; that the Rebellion was then flagrant, and all loyal men were earnestly hoping and working for its overthrow. And it is not surprising to find that men full of patriotic ardor, acting under such circumstances, should have their judgments warped, and deem it to be a personal or official duty to do many things to which the law cannot lend its sanction. Indeed, it would be remarkable if proceedings of this kind, had under such circumstances, and considering that the persons to be principally affected by them were absent, engaged in the Rebellion, or within the rebel lines, should be marked with that regularity, and that fairness and regard for the rights of property owners, that ordinarily characterize such proceedings in peaceful times and settled communities.

While these facts may, in one aspect of the case, be considered in explanation and extenuation of the commissioners' action, they cannot impart legal sanction to such proceedings. Congress, looking to the difficulty attending the collection of the taxes under such circumstances, made this law unprecedentedly rigorous in its provisions. But the commissioners could not add to its rigors, or confederate with others for that purpose. They were civil officers, intrusted with the execution of a naked power, under a statute that plainly defined their duties. They were to apportion and collect the tax according to law, and, if the tax was not paid, sell the property in the manner pointed out by the statute. If the law did not reach a certain class of taxpayers as effectually, in their opinion, as the demands of the occasion required, they could not supply the defect by any action of their own. It was no part of their duty to punish rebels. "The power of punishment is alone through the means which the law has provided for that purpose, and, if they are ineffectual, there is an immunity from punishment, no matter how great an offender the individual may be, or how much his crimes may have shocked the sense of justice of the country, or endangered its safety." Mr. Justice Davis, in Ex parte Milligan, 4 Wall. [71 U. S.] 119. They could not lawfully make any distinction, in their official action, between a rebel and a loyal man, except where the law made such distinction, and that it did not do until the point of redemption was reached. It is the act, and not the motive, that constitutes fraud in law, in many cases, and in proceedings of this kind fraud may exist without any mercenary motive on the part of the officer. The arrangement between one of the commissioners and Bliss, that Bliss should purchase a certain parcel of property for the commissioner at the tax sale, may have been made without any intention in fact to defraud, in a moral sense, the owner of the property or the government, and yet, in law, such a purchase would be fraudulent and void, both as to the government and the owner of the property. Considerations of public policy forbid such a proceeding, because the direct and necessary tendency is to encourage and invite fraudulent action. Chandler v. Moulton, 33 Vt. 245, and cases there cited. "The sale is open to all except the commissioners themselves, who are the vendors, and cannot therefore both buy and sell." Fox v. Cash, 1 Jones [11 Pa. St.] 207.

Though the commissioners acted without expectation of pecuniary advantage to themselves, but animated by a desire to punish rebels and advance the interests of Bliss, yet, if the accomplishment of these ends involved a breach of legal and official duty, to which Bliss was privy, such action is, in law, fraudulent and void. For, in addition to those acts which are held to constitute actual moral fraud, any act of omission or commission, contrary to legal or equitable duty, trust, or confidence, justly reposed, and which is injurious to another, though it falls short of moral fraud, is within the remedial jurisdiction of a court of equity. Will. Eq. Jur. 147; Kerr, Fraud & M. 2. The result of such action was not the less injurious and oppressive

to those who suffered by reason of it than if it had been prompted by the most mercenary or corrupt motive. Public officers cannot use their official position, and exceed the limits of their jurisdiction or authority, to advance the interests of one citizen at the expense of the legal rights of others; and where such action is participated in by the party to be benefited thereby, the sanction of a court of equity cannot be invoked for its protection. It is a maxim of the law that fraud vitiates everything. Tax sales are not excepted from the operation of this maxim. On the contrary, it is said, a more rigid scrutiny into their fairness is demanded, because of the gross inadequacy of the price usually paid at such sales, and the great inducements held out for the perpetration of fraud in the conduct of them. Blackw. Tax Titles, 396. And what is here said applies with redoubled force to a tax sale had under the circumstances this was.

To conclude this branch of the case, my opinion is that these proceedings, including the sale of the property to Bliss, are marked by such and so many flagrant violations of law and official duty, and such systematic, unwarranted, and oppressive action against the owners of property to defeat the payment of taxes, and such marked and unauthorized favoritism to Bliss, and so many circumstances tending to show collusion between the commissioners, or one of them, and Bliss, that no court of equity can fail to put its seal of condemnation upon the tax sale, and stamp it as fraudulent and void. And in this conclusion I am supported by the opinion of the court, delivered by Justice Miller at the last term, on the motion for a receiver. where it is said: "This application is urged upon the ground * * * that the title of the defendants is not only void in law, but that the tax proceedings were accompanied with such positive acts of fraud on the part of Bliss and one of the tax commissioners, that for these reasons alone the sale should be held to be void; and these allegations of the bill are well supported by depositions taken in the suit." I may add that many depositions, tending strongly to strengthen this conclusion, were read on the final hearing that were not then taken, and of course were not read on the motion to appoint a receiver. Schenck, having confessed in his answer that he is not a bona fide purchaser for a valuable consideration, is affected equally with Bliss by this fraud.

4. But, granting that there was a full board of tax commissioners, and that the tax proceedings were free from fraud, were they otherwise regular and valid? Before proceeding to notice the several points relied on as invalidating the sale, it is necessary to determine what weight, as evidence, shall be given to the certificate of purchase. The seventh section of the act provides that the purchaser shall "be entitled to receive from said commissioners their certificate of sale, which said certificate shall be received in all courts and places as prima facie evidence of the regularity and validity of said sale and the title of the purchaser." And the following provision occurs at the end of the same section: "And provided further, that the certificate of said commissioners shall only be affected as evidence of the regularity and validity of sale by establishing the fact that said property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed according to the provisions of this act." The case has been argued on the assumption that the two clauses in this section above quoted embraced all the statutory provisions on the subject. Under this clause the existence of the facts (1) as to whether the property was subject to the taxes, (2) whether the taxes had been paid, (3) whether the property had been redeemed, are left open to be questioned. If the property was subject to the tax under the law, and the tax was not paid, and the property not redeemed, and the certificate is regular on its face, is there any other matter or thing so vital to the authority of the government, to sell land for taxes, or to the rights of the delinquent owners of property, that congress may not declare they shall be conclusively presumed to have taken place? See 1 Greenl. Ev. §§ 15–17, 32; Murray's Lessee v. Hoboken Land Co., 18 How. [59 U. S.] 272. The right of a state legislature to declare such a presumption in this class of cases has been denied by the supreme court of Indiana (White v. Flynn, 23 Ind. 46), and doubted, at first, in Iowa (Allen v. Armstrong, 16 Iowa, 508; Adams v. Beale, 19 Iowa, 61), and afterwards its application denied, when the deed on its face shows a noncompliance with the requirements of the law (Boardman v. Bourne, 20 Iowa, 134), and finally declared not to be within the constitutional power of the legislature (Corbin v. Hill, 21 Iowa, 70). The court of appeals of Virginia, in commenting on this clause of the act of congress, says: "It cannot apply to a case where the defect of authority is apparent on the face of the certificate." Turner v. Smith. 18 Grat. 837. See Cooley, Const. Law, 367–369, and cases there cited; also cases cited in Brightly, Fed. Dig. p. 51, § 15.

If the determination of this question was necessary to the decision of the case, I should not be prepared to admit that the clause in question was repugnant to the constitution, but, holding, as I do, that it has been repealed, any discussion of the constitutional question is rendered unnecessary. By the second section of the act of March 3, 1865 (13 Stat. 501), the president was authorized and required to issue patents to the holders of these certificates. By the sixth section of a joint resolution passed February 25, 1867 (14 Stat. 568), the section of the act last referred to was repealed, and it is enacted that "certificates of sale shall be received in all courts and places as prima facie evidence of the regularity, and

validity of said sale, and of the title of the purchaser or purchasers under the same, as provided in section 7" of the original act, which provision I have already quoted. This is the last statute in point of time, and must control: If two inconsistent acts be passed at different times, the last is to be obeyed, and is, by implication, a repeal of all prior statutes, so far as it is contrary and repugnant to them. The last clause of the seventh section of the act of 1862 and this joint resolution are repugnant, and both cannot stand. If the certificates are prima facie evidence only, they cannot be conclusive, and if they are conclusive, they are more than prima facie evidence of a fact. And that it was the intention of congress to supersede the last proviso to section 7 is plainly shown by the declaration in the joint resolution, that they "shall be prima facie evidence as provided in section 7" of the act of 1862. Now, it is provided, in the body of that section, that they "shall be prima facie evidence." How could congress more clearly declare its intention to adopt this provision of the section as the rule determining the force of these certificates as evidence? Where two statutes were passed on the same day, one limiting a judgment lien to two years, and the other extending it to five, and a statute passed two years afterwards recognized the former statute as existing and in full force, it was held it would prevail over the latter, by force of such legislative recognition. Planters' Bank v. Black, 11 Smedes & M. 43. And see Sedg. St. & Const. Law, pp. 125, 129, 415; U. S. v. Irwin [Case No. 15,445]; Johnson v. Byrd [Id. 7,376].

5. The first objection taken to the regularity and validity of the proceedings of the commissioners is that the levy and apportionment of tax was 50 per cent. in excess of the amount the law authorized the commissioners to impose. It appears affirmatively that the commissioners, in addition to the per centum of tax they were authorized to apportion on the lands in the state, added thereto, at the time the apportionment and assessment was made, a penalty of 50 per cent., thus imposing on owners of property a penalty equal to one-half of their taxes before they were in default, and before, indeed, they had had an opportunity to pay, or could possibly have paid, their taxes. This penalty was imposed simultaneously with the apportionment of the tax, and no property owner was permitted to pay his tax without also paying this penalty. The first and second sections of the act, so far as they relate to a penalty, do no more than fix the liability of the land for the penalty of 50 per cent. in the event of delinquency. It is nowhere said it shall be charged and collected simultaneously with the tax, and before the owner has made default in the payment of his tax, or the land has become delinquent. On the contrary, the third section of the act expressly provides that, at any time within 60 days after the "tax" is apportioned, the owner "may pay the tax," and obtain a receipt that will discharge his land "from said tax," the word "penalty" not occurring in the section, and for the obvious reason that it would be out of place there, and, if it did not render the section repugnant to the constitution, would make it repugnant to natural justice and common right; and courts will not give to a statute a construction that will work such results, if it is susceptible of any other. A penalty is a punishment imposed by statute as a consequence of the commission of some act prohibited by law, or the omission to do some act or perform some duty required by law. What act had the owners of property done, or what had they omitted to do, that a penalty should be inflicted upon them simultaneously with the levy and apportionment of the tax, and before they could have paid it, if they had been ready and desirous so to do? Before a court would give a statute such a construction, it would have to be so clear, explicit, and mandatory in its terms as to leave no room for any other reasonable interpretation. But, taking the whole statute together, it is plain the intention was that the penalty should take effect and become an absolute charge upon the land after, and not before, default was made in the payment of the tax. The third and seventh sections of the act, when taken together, show this intention. The third provides the owner may, at any time within 60 days after the apportionment, "pay his tax," and the seventh section declares that, "in case the taxes on said land are not paid as provided for in the third section" of the act, then the commissioners may sell the land for the "taxes, penalty, and costs." The word "penalty" is carefully and properly omitted from the third section and in the first clause of the seventh section; and when it occurs in the first and second sections of the act, it is used to fix the liability of the land for the penalty that may be incurred by delinquency, and upon default of payment; and when it occurs in the seventh section, it is to authorize a sale for the tax, penalty, and costs, default having previously been made in the payment of "the taxes on the land," "as provided for in the third section" of the act. Any other construction would, in effect, make the penalty a part of the tax, and would be tantamount to a provision that the direct tax apportioned among the several states should, in the states in insurrection, be 50 per cent. greater than the apportionment made "according to their respective numbers," as required by the constitution

If an act of congress admits of two interpretations, one of which brings it within, and the other presses it beyond, their constitutional authority, the courts will adopt the former construction. U. S. v. Combs, 12 Pet. [37 U. S.] 72. The provision of the constitution, in relation to the apportionment of direct taxes gives to congress no power to discriminate between the states. The provision is mandatory. "It shall be apportioned according to their respective numbers." But it is said this is a penalty. Pen-

alty for what? Can congress apportion among the several states, according to their respective numbers, a direct tax, and then, as to some of the states, declare "a penalty of 50 per centum of said tax is hereby added thereto"? In the case supposed, what would be the difference between the tax and the penalty? Both are imposed at the same time, assessed at the same time, collected at the same time, and no possible escape from either except by payment. The truth is, in the case supposed, it would be an excessive apportionment of the direct tax, and calling it a penalty would not make it any the less an excessive apportionment of the tax. "Is the proposition to be maintained that the constitution meant to prohibit names and not things?" Chief Justice Marshall, in Craig v. State of Missouri, 4 Pet. [29 U. S.] 438. "The legal results would be the same, for what cannot be done directly cannot be done indirectly. The constitution deals with substance, not shadows." Mr. Justice Field, in Cummins v. State of Missouri, 4 Wall. [71 U. S.] 325. But it is said this penalty was imposed in order to defray the enhanced expenses attending the collection of the tax in the states in insurrection, and that the insurrection itself is a sufficient justification for such action, and will warrant the court in giving the statute the construction claimed for it.

As to the first proposition, it is a sufficient answer to say that the constitution of the United States expressly declares that "direct taxes shall be apportioned among the several states according to their respective numbers," and not according to the expense or difficulty of collecting the same in the several states. Much stress in the argument was laid on the fact of rebellion, and the act in question being, as it was said, a "war measure," which counsel assumed operated to exempt this act and the proceedings of the tax commissioners, the one from those canons of construction of universal application in the interpretation of statutes, and the other from the application of those rules and principles of law by which the validity of tax sales are universally tested. The use attempted to be made in this case of "war measures," and that indefinite quantity known as the "war power," would put such measures above all constitutional restraint, and those engaged in their execution above all law. This erroneous doctrine has been emphatically condemned and put at rest by the supreme court. "The constitution of the United States is a law for rulers and people, and covers with the shield of its protection all classes of men, at all times and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism. But the theory of necessity on which it is based is false, for the government within the constitution has all the powers granted to it which are necessary to preserve its existence, as has been happily proved by the result of the great effort to throw off its just authority." Ex parte Milligan, 4 Wall. [71 U. S.] 120. And from this proposition there was no dissent. The chief justice, speaking for the minority of the court in that case, says: "We agree in the proposition that no department of the government of the United States, neither president, nor congress, nor the courts, possesses any power not given by the constitution." Id. 136, 137. That congress, in passing this act, shaped its provisions in view of the Rebellion, is plain, and hence we have a statute for the collection of these taxes in the states in insurrection unprecedented in the rigor of its provisions, and which find as a matter of policy and justice their only justification in the abnormal condition of the country in which they were designed to operate. Certainly, a law under which, supposing the commissioners to comply with its terms, a man irrevocably loses his land if the taxes are not paid within six months—the law gives two months in which to pay taxes, the sale takes place two months thereafter, and two months are given after sale in which to make redemption, making, in all, six months—after the tax book is made up, is rigorous enough. Especially so, when we consider that the law contemplates the tax book shall be made up under protection of military authority, without any notice to property owners, and in a country where civil war was flagrant. Congress acted in full view of the facts, and made this law what it is, and the court cannot add to its rigors in one direction, and relax its requirements in another, for the protection of titles acquired under it. It may be conceded that congress intended, by the stringent provisions of this act, not only to collect the tax, but to have it operate as an inducement to the rebels to return to their allegiance, and, failing in that, that they should lose their property by its vigorous operation. Still these other objects hoped to be obtained by the law were to flow as incidents from its legal and valid execution and enforcement. For, certainly, if one may not violate a law, or exceed his authority to accomplish the declared purpose of a statute, he cannot do it in order that the incidental good hoped to be derived from its enforcement may be attained.

It must not be forgotten that the power to levy the tax and provide for its collection is derived from the constitutional grant of power to congress to "levy and collect taxes," and not from the Rebellion. While the Rebellion was undoubtedly the incentive to the stringent provisions contained in the act, it did not supply the power to enact them, and cannot be invoked to uphold irregular or illegal

action under them. No one will seriously pretend this penalty could be assessed as a penalty on the states for rebellion or insurrection. Nor will it be contended that it could be imposed on the owners of property for a like reason. Such an interpretation would render it obnoxious to the constitutional inhibition of ex post facto laws. It would be even worse than an ex post facto law, because it would be imposing a penalty on infants, nonsane persons, feme coverts, aliens, and many loyal men, equally with the rebel owners of lands. The assessment of this penalty was premature and illegal, and avoids all the subsequent proceedings. Any other rule of construction would put it in the power of a tax collector to coerce owners of property to pay any amount of excessive and illegal tax he might demand, under penalty of losing their lands if they refused to pay it. Indeed, I did not understand it to be questioned, in the argument, but what, if the assessment of this penalty was premature, it avoided the tax sale. Cooley, Const. Law, 520, and cases there cited; Blackw. Tax Titles (2d Ed.) 154, and cases there cited. Other objections to the regularity and validity of the tax sale arise out of acts occurring after the expiration of the 60 days allowed for the payment of the tax.

6. It is objected by the defendants in the cross bill that the complainant cannot avail himself of these irregularities. because he had no interest in the sale, and no right or title to the lands to be affected by it. This objection is based upon the assumption that, by the provisions of section 4 of the act, the land "became forfeited to the United States" at the expiration of the 60 days allowed to pay taxes; that this forfeiture was absolute, and ipso jure vested the title in the United States without and before a sale, and without the doing of any other act whatever. Section 3 of the act, as we have seen, provides that at any time within 60 days after the commissioners have fixed the amount of tax, the owners may pay the same; and section 4 provides that "the title in and to each and every piece or parcel of land. upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States, and, upon the sale hereinafter provided for. shall vest in the United States, or in the purchasers at such sale. in fee simple," etc. Whatever may be the correct interpretation of this section, it is clear no forfeiture occurred in this case at the expiration of the 60 days, for the reason that the amount of tax, "as above provided," never was apportioned and levied according to law. The addition of the penalty at the date of levying the tax being illegal, the forfeiture could not and did not attach. Before a statutory forfeiture, that by its own force divests an owner of his title to lands, can have effect, it must appear that all the prior proceedings were in exact conformity to law. A levy that is 50 per cent. greater than the law author-

izes is illegal and void, and no title can be acquired under or by virtue of such a levy, either by sale or forfeiture. It may be laid down as a principle of universal law that, in order to enforce these forfeitures, the courts require the same degree of strictness which is applied to ordinary tax sales in order to divest the title of the owner. Blackw. Tax Titles (2d Ed.) p. 460, and cases cited.

7. But, granting that the prior proceedings were regular, did the forfeiture, ipso jure, vest the title in the United States and divest the title of the owner at the expiration of the 60 days? On the one hand it is claimed that it did, and on the other that the provision is unconstitutional. I would not notice the constitutional question had it not been pressed by one of the counsel with unusual earnestness and ability, and did his argument not find support in a recent decision of a state court of the last resort, entitled to the highest respect. Bennett v. Hunter, 18 Grat. 100. In the case just referred to, a majority of the court held that the provision under consideration was repugnant to the constitution because (1) it deprived a man of his property without "due process of law," which is the point relied on by counsel in this case; (2) that this principle cannot "avail the United States in respect to lands, the title to which was not derived from them, which are not held under their authority, and to which they have not either actually or in theory the paramount title," and that such a right "cannot be claimed without touching upon the local sovereignty of the states, and their paramount title and jurisdiction." It is not perceived how the sovereignty of the states is touched by a law of congress for the collection of a direct tax, that operates directly on individuals and the property of individuals, and that does not affect the state in her corporate capacity, nor tax her lands. And though it is true of Virginia, it is not true as to most of the states, that the title to lands within their limits was not derived from the United States. In many of the new states the title was so derived, and the citizens of these states obtained their titles by patent directly from the United States, and in many instances the states themselves have been the recipients of the bounty of the United States. and obtained title by her grant to great quantities of the public lands, to aid in the construction of internal improvements, establish schools, etc. But it is not material from what source the title to land is derived. In this country the feudal system, as a law of tenures. is abolished, and every man is the absolute owner of the soil to which he has acquired title in conformity to law. It is nevertheless true that every man holds his lands, however absolute his property therein. subject to the right of the government. both state and national, (1) to forfeit it for the nonpayment of taxes lawfully levied for the support of the government, and (2) to the right of eminent domain. 1 Hil. Real Prop.

40, 41; 1 Washb. Real Prop. 41–44; 3 Kent, Comm. 513; Blackw. Tax Titles, pp. 2, 459.

It is conceded, in the opinion referred to, that it would be competent for a state legislature, in such cases, to pass the title by the mere force of the forfeiture declared by. the statute. Certainly, such right is not an open question in Virginia, which was one of the first states to exercise the right, having, as early as 1790, passed a statute of this kind, and subsequently, and at a much later date (1834), passed a similar act. And though these acts were often assailed as being repugnant to the constitution, that court has uniformly sustained their constitutionality. Wild's Lessee v. Sarpell, 10 Grat. 405; Levasser v. Washburn, 11 Grat. 572. And the doctrine in these cases is fully supported by the decisions in other states. Blackw. Tax Titles, tit. "Forfeiture." It is believed the constitution of every state in the Union contains, either in exact words or legal effect, the provision found in article 5 of the amendments to the constitution of the United States, which declares that "no person shall be deprived of life, liberty, or property, without due process of law." And if those words in a state constitution do not operate to restrain a state legislature from declaring an absolute forfeiture of lands for nonpayment of taxes, it is difficult to understand why they should have a different operation in the constitution of the United States, and on the power of congress over a subject confessedly within the powers of the national government, and within the express grant of legislative power to congress. The grant of power to congress "to levy and collect taxes. * * * to pay the debts, and provide for the common defense and general welfare of the United States" (Const. art. 1, § 8), is plenary, and is followed by a provision authorizing congress "to make all laws which shall be necessary and proper for carrying into execution" that power. Can the authority of the states to collect their taxes be any broader or more ample? It is granted that the national government is one of limited powers, but its power to tax its citizens, and collect that tax for its support and preservation, is not only one of the powers expressly given, but one without which it could not exercise the powers expressly delegated to it. It is an inherent right in all governments, and must have been implied in this, if it had not been expressly granted. And as long as "this constitution, and the laws of the United States which shall be made in pursuance thereof," continue to be the "supreme law of the land," this inherent right in all governments, granted by the constitution in plenary terms to the United States, "to levy and collect taxes" for its support, cannot be impeded or restricted by any department of a state government on the ground that its exercise infringes upon state sovereignty in some manner so remote as not to be seen or felt in its practical operation and effect. The truth is, it does no such

thing. The argument that it is an unlawful interference with "the paramount jurisdiction of the states over the lands in their jurisdiction" is based on an erroneous impression as to the effect the acquisition of the title by the United States to lands within the states has on the jurisdiction over such lands. The ordinary jurisdiction remains the same, and is not different from what it would be if the lands were owned by a private citizen, save in the matter of taxes, a burden which, by comity or positive law, is not imposed by either government on the lands of the other. Nor can any department of a state government prescribe or direct the mode and manner in which the United States shall collect her taxes. or restrict her right to impose penalties or forfeitures for their nonpayment. "The government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates · of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception." "When the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This .court disclaims all pretensions to such power." Chief Justice Marshall, in McCullough v. State of Maryland, 4 Wheat. [17 U. S.] 410, 423.

But, it is said, while states may, the United States may not, denounce an absolute forfeiture of lands for taxes; but that, in the case of the United States, there must be what the common law calls "inquest of office." Now. this common-law doctrine, that an inquest of office is necessary to vest forfeitures in the crown, has no more application to the United States, and the measures she may adopt for the collection of her revenues, than it has to the states, and like measures on their part; and it has no application to either when the statute supersedes it in clear and express terms, and it clearly appears that it was the intention of the legislation to vest the forfeiture by the mere force of the statute. In Fairfax's Devisee v. Hunter's Lessee, 7 Cranch [11 U. S.] 632, Mr. Justice Johnson says: "There is nothing mystical, nor anything of indispensable obligation in this inquest of office. It is, in Great Britain, a salutary restraint upon the exercise of arbitrary power by the crown, and affords the subject a simple and decent mode of contesting the claim of his sovereign; but the legislative power of that country may assert, and has asserted, the right of dispensing with it, and I see no reason why it was not competent for the legislature to do the same." And that it may be done for violations or nonobservance of the revenue laws is settled. "Where

a forfeiture is given by statute, the rules of the common law may be dispensed with, and the thing forfeited may either vest immediately, or on the performance of some particular act, as shall be the will of the legislature." Chief Justice Marshall, in U. S. v. Grundy, 3 Cranch [7 U. S.] 377. And see, to the same effect, The Florenzo [Case No. 4,886]; Sedg. St. & Const. Law, 97; Smith v. Maryland, 6 Cranch [10 U. S.] 286; U. S. v. 1960 Bags Coffee, 8 Cranch [12 U. S.] 398; U. S. v. Repentigny, 5 Wall. [72 U. S.] 211, 267, 268. In the last case cited, Mr. Justice Nelson, who delivered the opinion of the court, says: "And we agree that, before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted, or, in the technical language of the common law, office found, or its legal equivalent. A legislative act, directing the possession and appropriation of the land, is equivalent to office found. The mode of asserting or of assuming the forfeiture is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly under the authority of the government without these preliminary proceedings."

A sale of lands for taxes, by ministerial or executive officers, is not "office found," in the technical meaning of those words at common law, and if the United States is to be restricted by this common-law rule in the measures she adopts to enforce payment of her revenues, she cannot seize and sell or forfeit any property for unpaid taxes until a judicial investigation has been had. And that the words, "law of the land," have no application, in the sense contended for, to the measures the government may adopt to enforce the collection of its revenues, is clearly and conclusively shown in the very learned opinion of Justice Curtis, in Murray's Lessee v. Hoboken Land & Imp. Co., 18 How. [59 U. S.] 272. In the course of that opinion, after showing the proper interpretation of those words as applied to the case before the court, he says: "It may be added that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or public officer employed for their collection or disbursement, to become subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to." Of the power of the United States to denounce an absolute forfeiture of lands as a consequence of the nonpayment of the direct tax thereon, I have no doubt. The question will always be, as in this case, one of construction and not of power.

8. And now, does the forfeiture under this act vest at the expiration of the 60 days allowed to pay the taxes, or upon the sale of the land provided for in the seventh section? The language of the section is, "And upon the sale hereinafter provided for shall vest in the United States, or in the purchaser at such sale in fee simple," etc. If the title vested by force of the forfeiture, why this language? And if the land was already the absolute property of the United States, why provide, as is done in the seventh section, that said "commissioners shall be authorized at said sale to bid off the same for the United States, at a sum not exceeding two-thirds of the assessed value thereof"? Why should the government "bid off" land to which it already had a perfect title? Such language is not appropriate in directing the sale of land that belongs to the United States. A minimum price is fixed on public lands, and, if they do not sell for that sum, they are not "bid off" to the United States, but remain unsold. The ninth section of the act shows still more conclusively that this forfeiture did not vest until after the sale. By this section the commissioners are given authority to lease "said lots and parcels of ground," where the owners "have not paid the tax thereon, as provided for in the third section of this act, and the same shall have been struck off to the United States at said sale," thus making the purchase of the United States at tax sale a condition precedent to the right of the commissioners to lease the lands. Again, the eleventh section provides that the board of commissioners, under the direction of the president, may be authorized, instead of "leasing the said lands vested in the United States, as above provided, to sell the same," etc. It is manifest the words, "vested in the United States, as above provided," have reference to the provisions of section 9, between which section and section 11 there is a direct sequence and connection. And see Acts 1865, § 8; 13 Stat. 501. And the language used in the last proviso, now repealed, to section 7 of the act confirms this construction. Under that proviso the owner was allowed, among other grounds, to contest the validity of the tax certificate, by showing "that the taxes had been paid previous to sale." Now, does not this language clearly imply that the taxes may be paid any time "previous to sale"? If the forfeiture was absolute at the expiration of the 60 days, and no act of the owner either in paying or tendering the tax, or irregularity in the proceedings of the commissioners after that time, could be inquired into, the language would have been that the validity of the certificate might be contested by showing "that the taxes had been paid previous to forfeiture," instead of "previous to sale." There is not one sentence or word, aside from the word "forfeiture" itself, in the whole statute, that does not go to show that the intention of congress was that the title to these lands should not vest in the United States until after sale. And in this conclu-

sion I am supported by the opinion of that court from whose judgment, on the question of the power of congress to impose such a forfeiture, I have felt constrained to dissent. Bennett v. Hunter, 18 Grat. 126. If the other construction was given to the statute, it would result that all the lands and lots in this state, and elsewhere in the insurrectionary states, upon which the tax was apportioned and not paid within 60 days, and which were not sold because the collection of the tax was suspended, or for any other reason, were now the absolute property of the United States,—a result disclaimed by every department of the government, and that would be quite as startling to that department of the government whose special duty it is to look after and know what lands do belong to the public domain, as to the unsuspecting owner himself. Any other construction would make the sale of the land result in an actual benefit to the owner, because, if the forfeiture is absolute at the expiration of the 60 days, there is no redemption, and no means of divesting the forfeiture; whereas, if it is sold, the owner has 60 days after sale in which to redeem. When those familiar rules for the construction of statutes denouncing penalties and forfeitures are applied to this act, all doubt as to its proper construction is removed. The other points in the case may be disposed of in a few words.

9. It is in proof that Dr. John Kirkwood was a creditor of Peay, the owner in fee of the property in question, and that he had a valid attachment lien on all the property, and as such lien creditor, as well as for Peay, he tendered to the commissioners, before the sale of the property, all the taxes, interest, and costs due on the same, which they refused to receive. It is further shown that the fact of this tender was announced in Bliss's presence by the commissioner when he offered the property for sale, and that Bliss purchased with full notice of the fact that the taxes, penalty, and costs had been tendered. It further appears that, soon after the sale, and within the 60 days allowed for redemption, Dr. Kirkwood, who, it is shown, was a loyal man, and had never, in any manner, been implicated in the Rebellion, and whose lien on the property was still in full force, went before the commissioners, "in his own proper person," and took an oath "to support the constitution of the United States," as required by the act, and again tendered the taxes, penalty, and costs due on the property, and demanded that he be allowed to redeem the same. The last tender was made in strict conformity to the very letter of the act, and by a person expressly authorized to redeem, by the terms of the act, which declares that "any loyal person of the United States," having valid lien upon or interest in the same, may, at any time within 60 days after said sale, appear before the said commissioners, and, upon taking the oath and paying the taxes and expenses as

therein provided, "may redeem said lots and lands from said sale." The commissioners refused the tender before sale, holding that no one but the legal owner of the fee of the property, in proper person, could pay the taxes, and the last tender was refused on the supposition that that part of section 7, giving to lien creditors a right of redemption, had been repealed by section 4 of the act of March 3, 1865 (13 Stat. 501), in which supposition they were mistaken, the last act mentioned being cumulative merely, and in no manner inconsistent with or repugnant to the right of a lien creditor to redeem. The last act simply provides that, in case the land is not redeemed by any one, the lien creditors may, with certain limitations, have their liens satisfied out of the proceeds of the sale of the lands in the treasury.

Independent of the provisions of the act, expressly giving them the right to redeem, lien creditors would have had that right. The following summary of the law on this point by Mr. Blackwell is fully supported by the authorities: "It may therefore be laid down as a general rule that any right, whether in law or in equity, whether perfect or inchoate, whether in possession or action, amounts to an ownership in the land, and that a charge or lien upon it constitutes the person claiming it an owner, so far as it is necessary to give him the right to redeem." Blackw. Tax Titles, 496 (2d Ed. 423, 424), and cases there cited; Dubois v. Hepburn, 1 Pet. [26 U. S.] 1–23; Adams v. Beale, 19 Iowa, 61, 68, 69; Burton v. Hintrager, 16 Iowa. 348. And if a person having a charge or lien upon land is an owner, so far as it is necessary to give him the right to redeem, a fortiori, he may pay the taxes on the land before the sale. And Dr. Kirkwood having the right to pay the taxes on this property, his tender of them in proper person was equivalent in law to the like tender by the owner of the fee, and ipso facto divested the commissioners of all right or authority to sell the property. A law that would require the citizen to appear in his own proper person to pay the tax on his lands, and that denied to his agents and lien creditors the right to pay such tax, would be such a departure from the known purpose and object of revenue laws, such an infringement upon the well-established rights of the citizen, and so opposed to the plain and obvious dictates of reason and justice, that nothing but the most irresistible language, affirming the one proposition and expressly excluding the other, would induce a court of justice to suppose a design on the part of the law-making power to effect such objects. Such a requirement, when we reflect that no inconsiderable portion of the lands are owned by persons incapacitated to perform any act (infants, insane persons, and feme coverts), and where, from the great distance to be traveled, and the age and infirmities of other owners, it would be physically impossible for them to comply with the law, would be against com-

mon right and reason,—a sufficient reason, according to Lord Coke, for declaring void an act of parliament itself. And see 1 Kent, Comm. (10th Ed.) 503; Riggs v. Martin, 5 Ark. 506. But congress has attempted no such thing in this act, as is claimed. A just and fair interpretation of the act, in this respect, makes it consistent with common right and reason. The words "owner," or "owner in person," do not exclude an agent, or one having an interest in or lien on, the land, from paying the tax, and for the obvious reason that the words "or agent, or other person interested," or equivalent words, are necessarily implied by the law, and what is implied in a statute is as much a part of it as what is expressed. U. S. v. Babbit, 1 Black [66 U. S.] 61; Gelpcke v. Dubuque, 1 Wall. [68 U. S.] 221. It is held that, under the act of congress now in question, a mere stranger may pay the tax any time before sale, and that a tender by such stranger is effectual, and avoids the sale. "If the money is paid, no matter by whom, before a sale is made, the reason for the making a sale ceases, and the authority to make it ceases also. If the money, instead of being actually paid, is tendered to the commissioners, and they refuse to receive it because not tendered by the owner in person, the legal effect is the same as if it had been paid." Bennett v. Hunter, 18 Grat. 147, 148. And the tender to redeem, made in conformity to law, divested the title acquired under the purchase at the tax sale as effectually as if the money had been received by the commissioners, as it ought to have been, and the redemption regularly entered in the books of the commissioners. See Corbett v. Nutt, 18 Grat. 641, 642.

10. It is also shown that the sale of the property was made by one commissioner, Cowperthwaite, in the absence of his co-commissioner, Vance, who was, at the time of the sale, beyond the limits of the city of Little Rock, which was all the territory in which the taxes had then been apportioned in the district, and the absent commissioner is not shown to have been consulted or advised with, in reference to said sale or the manner of conducting the same. One of a board of three commissioners could not, under the acts of 1865 and 1868, perform the most material act in the proceedings of the board, and the only act that could divest owners of the title to their property, without the presence and concurrence of at least one of his co-commissioners. The sale, having been made by Cowperthwaite alone, without the presence or advice of his co-commissioner, is void for that reason. The fact that Commissioner Vance subsequently signed the certificates of purchase is not, in itself, sufficient to obviate this objection. The government, the bidders, and the owners of property, were alike entitled to his presence, influence, and advice in conducting the sale, and his voice in settling the questions that might then arise, as well as to see that the sale was fairly and properly

conducted, without prejudice to the rights of any. His subsequently signing the certificates of purchase, without personal knowledge of the facts, is not equivalent in law to his presence at the sale, and the performance of his duty, and the exercise of his just influence in conducting the same. It is a well-settled rule of construction, in tax-title cases, that no fact can be made out by intendment, and no presumption indulged, in favor of such title. And the court will not presume that the absence of two commissioners of a board of three worked no prejudice on so important an occasion. In the case of Town of Middletown v. Town of Berlin, 18 Conn. 189, where one member of a board of five had assumed to perform some duties pertaining to the levy and assessment of taxes, his acts were held void, and the court said: "It is believed that no case can be found which will justify the performance of a duty, required of an aggregate body, by one only, as has been attempted here." See Blackw. Tax Titles, 136 et seq. (2d Ed., 110 et seq.).

Other objections are made to the regularity and validity of these proceedings, which I pretermit for the reason that the points already ruled on will doubtless reach all the cases pending, and any ruling upon others is unnecessary.

Since the argument, a case has come to my notice (Turner v. Smith, 18 Grat. 830) in which it is held that the provision of section 7 of the act of 1862, that "said commissioners shall be authorized at said sale to bid off the lands for the United States at a sum not exceeding two-thirds of the assessed value thereof," is mandatory, and that a sale of delinquent lands to a citizen for less than two-thirds of their appraised value is void. If this is a correct interpretation of the act, it would be an additional ground for avoiding the sale in this case. But, as the point was not argued, I forbear expressing any opinion on it. A decree will be entered for the complainant in the cross bill in conformity to this opinion.

NOTE. By order of the court at the April term, 1868 [Case No. 12,450], the property in controversy in this case was put into the hands of a receiver, with the usual directions. On the rendition of the decree at this term, which, among other things, required the receiver to turn over the possession of the property and the rents to Peay, the complainant in the cross bill, the defendants, Schenck and Bliss, prayed an appeal, which was allowed; and thereupon a supersedeas bond was filed and approved, in a penalty fixed by the court ($6,000) sufficient to cover costs and the rents of the property received by Bliss prior to the appointment of a receiver, and for which, by the terms of the decree, he was required to account. [The appeal was abandoned after the judgment of the supreme court in Bennett v. Hunter, 9 Wall. (76 U. S.) 326.]

On a subsequent day, the defendants, Schenck and Bliss, by their solicitors, moved for an order directing the receiver to turn over to them the possession of the property and the rents in his hands, on the ground that a party who appeals and files a supersedeas bond is thereby entitled to have delivered to him any money or property in the hands of a re-

ceiver, or in the custody or control of the court, if, as was the case here, that custody or possession had been taken from him, in the progress of the litigation, by an order appointing a receiver or otherwise.

By the Court: The motion is overruled. The supersedeas bond was only intended to cover the actual present liability of the defendants under the decree. Even if the bond was in a penalty equal to the value of all the rents, past, present, and prospective, it could not have any other effect than to stay the active operation of the decree, and would not entitle the defendants to the active interposition of the court in their behalf, and the revocation of orders existing at the date of the decree, and to the custody of property and money in the hands of the receiver in pursuance of such orders. See Smith v. Allen, 2 E. D. Smith, 259; Stafford v. Kirkland, 16 How. [57 U. S.] 135.